Doris JACOBS and Phillip Jacobs (93–4144); Patricia A. Adelmann, et al. (93–5978/6561), Plaintiffs–Appellants,

v.

E.I. DU PONT DE NEMOURS & COMPANY, Defendant–Appellee.

Nos. 93–4144, 93–5978 and 93–6561.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 29, 1994.

Decided Oct. 19, 1995.

Ronald S. Goldser (briefed), Barry G. Reed (argued), Zimmerman & Reed, Minneapolis, MN, David Looney, Blakemore, Meeker, Varian, Looney & Bowler, Akron, OH, for Plaintiffs-Appellants in No. 93-4144.

Laura Kingsley Hong, Robin G. Weaver, Squire, Sanders & Dempsey, Cleveland, OH, Nina M. Gussack, Pepper, Hamilton & Scheetz, Philadelphia, PA, Edward M. Mansfield (argued and briefed), Stephen M. Bressler, Lewis & Roca, Phoenix, AZ, for Defendant-Appellee in No. 93-4144.

David Randolph Smith (argued and briefed), Nashville, TN, for Plaintiffs-Appellants in Nos. 93-5978 and 93-6561.

Edward M. Mansfield (argued), Stephen M. Bressler (briefed), Lewis & Roca, Phoenix, AZ, Mark J. Patterson, Waddey & Patterson, Nashville, TN, for Defendant-Appellee in Nos. 93-5978 and 93-6561.

Before: RYAN and BOGGS, Circuit Judges; and ROSEN, District Judge.*

ROSEN, District Judge.

This opinion consolidates the appeals of two actions filed against a common defendant—E.I. du Pont de Nemours & Co. ("Du Pont")—involving similar product liability claims. The claims arose from Du Pont's sale of materials used in an artificial cartilage replacement for the temporomandibular joint ("TMJ"), also known as the jaw joint, called the TMJ Interpositional Implant ("IPI"). The IPI was manufactured and distributed by Vitek, Inc., a now-bankrupt prosthesis manufacturer.

## I. PROCEDURAL BACKGROUND

### A. JACOBS v. DU PONT

On February 10, 1993, Appellants Doris A. Jacobs and Phillip Jacobs commenced a product liability action against Du Pont, seeking recovery for injuries suffered by Ms. Jacobs allegedly as a result of Teflon[1] contained in her IPI. The Jacobs alleged defective design and manufacture claims, as well as claims that Du Pont failed to warn end-users about the dangers posed by the use of Teflon in medical implants.

On November 14, 1993, the district court granted Du Pont's motion for summary judgment and dismissed Appellants' complaint.

### B. ADELMANN v. DU PONT

On July 17, 1991, Appellants Patricia A. Adelmann and her husband, Randall B. Adelmann, filed a similar four-count complaint against Du Pont. They alleged the following: (1) that Du Pont was strictly liable for (a) the defective design of Teflon as used in the IPI, and/or (b) the failure to warn end-users of the dangers posed by Teflon as used in the IPI; (2) that Du Pont was negligent in failing to test Teflon as used in the IPI and in failing to warn end-users of the dangers posed by Teflon as used in the IPI; (3) that Du Pont was in breach of an implied warranty of merchantability by selling products that were unfit for ordinary purposes; and (4) that Du Pont was liable for fraud in allowing Vitek to use Du Pont's name to market the IPI and in concealing the dangers posed by Teflon as used in the IPI. *See Adelmann* Jt.App. 15–20. Twenty-five other cases, making the same allegations and brought by the same counsel, were joined to the *Adelmann* case and are also on appeal.

On February 28, 1992, Du Pont filed a motion for summary judgment before the Hon. Thomas A. Wiseman, Jr., arguing that it had no duty to warn end-users of any known dangers concerning the use of Teflon products in the IPI.[2] Appellants responded on June 22, 1992, by moving to compel discovery of, *inter alia*, "[a]ll legal memoranda

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Teflon is the trade name for a plastic developed by Du Pont. The name is protected by trademark laws. For the sake of simplicity, this opinion does not include the trademark insignia after each use of the term.

2. Importantly, Du Pont invoked the "bulk supplier/sophisticated intermediary" doctrine in a footnote to its summary judgment brief. That brief states:

Tennessee courts do not limit the learned intermediary doctrine to the drug context. Bulk suppliers of inherently dangerous raw materials also are entitled as a matter of law to rely upon sophisticated purchasers, informed of potential dangers of the product, who resell the raw material after repackaging it or incorporating the raw material into another product. *Byrd v. Brush Wellman, Inc.*, 753 F.Supp. 1403 (E.D.Tenn.1990) (granting summary judgment for defendant beryllium supplier because it had no duty to warn ultimate users); *Whitehead v. Dycho Co.*, 775 S.W.2d 593 (Tenn.1989) (affirming summary judgment for defendant

(filed with any court), pleadings and court papers, including orders, opinions, or memoranda of the court in connection with any [and] all summary judgment motions filed by DuPont in any TMJ case." *See Adelmann* Jt.App. 144. On July 9, 1992, Judge Wiseman denied this motion on the grounds that the "[i]nterrogatories and requests are overbroad and [not] reasonably calculated to lead to admissible evidence." *See Adelmann* Jt. App. 180.

On July 13, 1992, Appellants filed a brief, a statement of facts, and 166 exhibits, all in opposition to Du Pont's summary judgment motion. *See Adelmann* Jt.App. 594–1197.[3] Judge Wiseman conducted a hearing on Du Pont's motion on September 28, 1992. Shortly after the hearing, Appellants filed a motion to amend their complaint to allege a claim for breach of an implied warranty of fitness for a particular purpose. Before Judge Wiseman could issue an opinion on the pending motions, however, he recused himself on October 1, 1992.

The case was reassigned to the Hon. Robert L. Echols, who heard oral argument on Du Pont's motion for summary judgment on December 7, 1992. At this hearing, Du Pont argued—according to Appellants for the first time—that even if Du Pont had a duty to warn, this duty was discharged under the bulk supplier/sophisticated intermediary doctrine. *See Adelmann* Jt.App. 529–32 (transcript of 12/7/92 hearing, pp. 15–18). Appellants objected to the procedural propriety of this argument by noting that "[it was] not in their motion that they met the duty." *See Adelmann* Jt.App. 541 (*id.,* p. 27). However, Appellants also suggested to the court at oral

argument that "the record is replete with documents showing that [Du Pont] did not [meet its duty to warn]." *See Adelmann* Jt.App. 543 (*id.,* p. 29).

Following the hearing, Appellants submitted to the district court a copy of the transcript of Judge Wiseman's hearing, as well as three supplemental briefs in opposition to Du Pont's summary judgment motion. In two of the three memorandum (dated March 19 and April 23, 1993), Appellants focused solely on the question of the bulk supplier/sophisticated intermediary doctrine. *See Adelmann* Jt. App. 412–21, 1128–38. In particular, the April 23, 1993 brief contained the following argument: "Plaintiffs strenuously state that on *this* summary judgment record the Court has ample evidence to conclude that it was not reasonable for DuPont to rely upon Vitek." *See Adelmann* Jt.App. 417 (emphasis added).

On June 22, 1993, the district court entered summary judgment in favor of Du Pont. Appellants moved for relief from the judgment in accordance with Fed.R.Civ.P. 59 on July 22, 1993. The district court denied this motion on November 3, 1993.

For the following reasons, we affirm the district court decisions in both *Jacobs* and *Adelmann* granting summary judgment in favor of Appellee Du Pont.[4]

## II. FACTUAL BACKGROUND

### A. THE TEMPOROMANDIBULAR JOINT INTERPOSITIONAL IMPLANT.

The operative facts are virtually identical and largely undisputed in both *Jacobs* and

chemical suppliers because they had no duty to warn ultimate users). In both cases, the courts reasoned that the sophisticated raw materials purchasers were the *only* entities in a position to issue an effective warning to the ultimate users. *See Byrd,* 753 F.Supp. at 1413; and *Whitehead,* 775 S.W.2d at 600.
*See Adelmann* Jt.App. 111–112 (Du Pont's summary judgment brief, pp. 17–18 n. 4) (emphasis in original).

3. Appellants' summary judgment response brief discussed the bulk supplier/sophisticated purchaser defense. *See Adelmann* Jt.App. 610–12.

4. Other circuit courts of appeal have rejected similar claims made against Du Pont. *See Klem v. E.I. Du Pont de Nemours Co.,* 19 F.3d 997 (5th Cir.1994) (applying Louisiana law); *Rynders v. E.I. Du Pont, de Nemours & Co.,* 21 F.3d 835 (8th Cir.1994) (applying South Dakota law to affirm a jury verdict in favor of Du Pont); *Apperson v. E.I. du Pont de Nemours & Co.,* 41 F.3d 1103 (7th Cir.1994) (applying Illinois law); *Anguiano v. E.I. Du Pont de Nemours & Co., Inc.,* 44 F.3d 806 (9th Cir.1995) (applying Arizona law). Moreover, in a recent opinion disposing of approximately 280 IPI cases filed against Du Pont that had been transferred to the United States District Court for the District of Minnesota by the Judicial Panel on Multidistrict Litigation, the court granted summary judgment in favor of Du Pont. *In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation,* 844 F.Supp. 1553 (J.P.M.L.1994).

*Adelmann.* As stated above, Appellants claims arose from Du Pont's sale of materials used in the TMJ Interpositional Implant known as the IPI. The IPI was manufactured and distributed by Vitek, Inc., a now-bankrupt Houston prosthesis manufacturer formed in 1969. Dr. Charles Homsy,[5] a former Du Pont employee, was the founder, president, and chief shareholder of Vitek.

Dr. John Kent, an oral surgeon and consultant to Vitek, invented the IPI. *See Jacobs* Jt.App. 151–52 (Homsy 2/5/92 deposition, pp. 102–103). The device was designed to replace damaged cartilage, known as the meniscus, which is located in the TMJ of the human jaw. The implant is made from two components: (1) Proplast[6] and (2) fluorinated ethylene propylene film ("FEP").

Proplast, which Dr. Homsy invented in 1968 while working for Methodist Hospital in Houston, is a composite consisting mainly of polytetrafluoroethylene ("PTFE"),[7] a form of

Du Pont's plastic product line known as Teflon. To manufacture Proplast, Vitek used an elaborate process to combine the PTFE with salt and either carbon fibers or aluminum oxide fibers.[8] Proplast is a soft, spongy substance, which is porous.[9] The purpose of Proplast in the IPI is to anchor the implant to the upper bone, which forms the TMJ (the glenoid fossa), which is also the lower portion of the skull.[10]

In order to protect the Proplast in the IPI from pressure caused by the condyle, or jaw bone, which is the other half of the TMJ, Vitek added Du Pont-manufactured FEP film to the IPI.[11] The FEP film was laminated to the surface of the Proplast, to act as a buffer to protect the Proplast from wear inside the TMJ. *See Jacobs* Jt.App. 163–64 (Homsy 6/6/92 deposition, pp. 201–02). The parties dispute whether the FEP was altered from Du Pont's original form when it became part of the IPI.[12]

5. Dr. Homsy received a Doctor of Science degree in chemical engineering from M.I.T. in 1959. This degree is the equivalent of a Ph.D.

6. Proplast is a name protected by trademark laws. For the sake of simplicity, this opinion does not include the trademark insignia after each use of the term.

7. Vitek directly purchased PTFE powder and resin from Du Pont in bulk containers of 50 pounds or more. *See Jacobs* Jt.App. 204 (affidavit of John S. Lindell, a product manager in Du Pont's Specialty Polymers Division).

8. Vitek went through an eight-step process to manufacture Proplast. This process involved mixing, filtration, compression, rolling, drying, sintering (heating), leaching, and further drying. *See Veil v. Vitek, Inc.,* 803 F.Supp. 229, 230 n. 1 (D.N.D.1992). *See also Jacobs* Jt.App. 252 (Homsy Patent No. 4,129,470). It should be noted that Appellants contend that the sintering step did not alter the PTFE particles in any way.

9. According to Du Pont, PTFE, unlike Proplast, is a non-porous, smooth substance. *See Jacobs* Jt.App. 251 (page from Homsy Patent No. 4,129,-470).

10. Du Pont points out that Vitek conducted extensive animal and clinical studies on Proplast as a biomaterial throughout the 1970s and early 1980s. *See* 47 Fed.Reg. 2810, 2818 (January 19, 1982). Importantly, some of the studies done to test Proplast's medical applications involved load-bearing situations. *See Jacobs* Jt.App. 106–

08, 114–15, 172–75 (Homsy 2/5/92 deposition, pp. 38–40, 48–49; 6/7/92 deposition, pp. 619–22). In addition, one of the studies submitted to the FDA was Dr. Kent's work with FEP-laminated Proplast in the TMJ. *See Jacobs* Jt.App. 147 (Homsy 2/5/92 deposition, p. 98).

The FDA proposed approval of Proplast, subject to certain regulations, for use as a dental device in 1980 and as an ear, nose and throat device and a general plastic surgery device in 1982. *See* 45 Fed.Reg. 86031 (December 30, 1980); 47 Fed.Reg. 2810, 2818 (January 19, 1982). Final approval for these applications, again subject to certain regulations, occurred in 1987 (dental applications) and 1988 (ear, nose and throat and general facial plastic surgery applications). *See* 21 C.F.R. §§ 872.3960 and 878.3500. In making these approvals, the FDA concluded: "[T]he safety and effectiveness of [Proplast] has been established through long-term clinical trials." 47 Fed.Reg. at 2818.

11. FEP is another one of Du Pont's Teflon products which Vitek purchased from intermediaries for use in the IPI.

12. Appellants assert that there was no change in the FEP from the time it left Du Pont to its inclusion in the IPI. *See Jacobs* Appellants' Brief, p. 4. Du Pont contends that by melting the FEP film and laminating it to the Proplast, the FEP film's crystalline structure changed. Du Pont concedes, however, that the chemical content of the FEP stayed the same. *See Jacobs* Jt.App. 166–67 (Homsy 6/6/92 deposition, pp. 211–12).

In 1982, Dr. Kent reported to Vitek that, after several years of experimentation, he had successfully used FEP-laminated Proplast in the human TMJ. He further recommended that Vitek introduce a preformed TMJ implant utilizing the same materials. *See Jacobs* Jt.App. 151–52 (Homsy 2/5/92 deposition, pp. 102–03). Vitek conducted further tests to see if the FEP lamination could withstand the loads in the TMJ, and the results were positive. *Id.* at 152–56 (Homsy 2/5/92 deposition, pp. 103–07). Vitek began selling the IPI after it received authorization from the U.S. Food and Drug Administration ("FDA") to market the product in early 1983.[13]

Both PTFE and FEP were part of the IPIs implanted in Ms. Jacobs in 1985 and Ms. Adelmann in 1987.[14] It is undisputed that the FEP laminate failed to keep the PTFE-containing Proplast from breaking down within and through the FEP film. As the implants broke up, released Proplast and FEP particles caused extensive injuries.

In Ms. Jacob's case, the Proplast and FEP particles generated foreign-body giant cell reactions, which in turn created tumorous masses which ate away at the bones in her jaw. Ms. Jacobs has apparently suffered continuous pain in her jaw when eating or sleeping since the implants were inserted.

This pain has continued despite the removal of the implants in May, 1992. Ms. Jacobs also has difficulty opening and closing her jaw, and she suffers from a facial paralysis called ptosis. Moreover, the particles released into her face injured her right eardrum, resulting in the loss of 80% of the hearing capacity in that ear. *See Jacobs* Appellant's Brief, pp. 13–14.

### B. FACTS RELATING TO DU PONT'S LIABILITY.

#### 1. Early Reports Suggesting The Dangers Of PTFE In Load–Bearing Joints.

In the late 1950s and early 1960s, Dr. Sir John Charnley, a surgeon at Wrighton Hospital near London, England, attempted to use PTFE to replace worn cartilage in hip joints, the load-bearing joint bearing the most weight in the human body. In an article published in 1963 in *The Lancet,* Dr. Charnley reported that "I had to abandon PTFE because its wear was much more rapid than had been expected, and more especially because the particles of PTFE which were abraded from the surface of the bearing produced a severe foreign-body reaction, resulting in granulomatous tissue and bone erosion." *See Jacobs* Jt.App. 350 (John Charn-

---

13. The authorization letter, dated March 23, 1983, states, in relevant part:

> We have reviewed your Section 510(k) notification of intent to market the [IPI], and we have determined the device to be substantially equivalent to one marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments of 1976. You may, therefore, market your device subject to the general controls provisions of the Federal Food, Drug and Cosmetics Act (Act) until such time as your device has been classified under Section 513.
>
> \* \* \* \* \* \*
>
> This letter should not be construed as approval of your device or its labeling.

*See Adelmann,* Jt.App. 924.

The FDA did not classify the IPI or other TMJ implants until 1992. *See* 57 Fed.Reg. 43169 (September 18, 1992). It also never issued any regulations on the IPI before it ordered that the device be pulled from the marketplace in early 1991. *See Lamontagne v. E.I. du Pont de Nemours & Co.,* 834 F.Supp. 576, 584–85 (D.Conn. 1993).

14. Du Pont notes that both PTFE and FEP are used in a wide variety of industrial and medical applications. *See Jacobs* Jt.App. 231–34 (industrial applications of PTFE listed in 16 *Encyclopedia of Polymer Science and Engineering* 595–98 (2d ed. 1989)); *Jacobs* Jt.App. 247 (industrial applications of FEP also listed in *Encyclopedia, supra,* at 611); *Jacobs* Jt.App. 287–293 (medical applications of PTFE (cardiovascular implants, artificial vein grafts and maxillofacial augmentation) and FEP (sutures, middle ear tubes and tracheal tubes) found in a chapter Dr. Homsy wrote for *Biocompatibility of Clinical Implant Materials* (David F. Williams ed. 1981)).

Du Pont further asserts that PTFE and FEP are safe and inert when placed in the human body. *See Jacobs* Jt.App. 128–29; 146 (Homsy 2/5/92 deposition, pp. 64–65, 67; Dr. Homsy testified that PTFE and FEP were well-tolerated by artificial body fluid and that FEP was well-tolerated in the bodies of animals).

Finally, Du Pont posits that the PTFE and FEP used in the IPI represented only a few cents worth of the IPI's $50.00 minimum purchase price. *See* Du Pont's *Jacobs* Brief, p. 7.

ley, "An Artificial Bearing in the Hip Joint: Implications in Biological Lubrication," 11 *The Lancet* 1379 (1963)). In a letter to the editor of *The Lancet,* published in the periodical's December 28, 1963 issue, Dr. Charnley reiterated his warning by stating:

> Surgeons, and especially orthopedic surgeons, should be warned that tissue reactions are likely to follow the implantation of [PTFE] if this material is subject to abrasion, and that these reactions may not be manifest for two years.
>
> \* \* \* \* \* \*
>
> Particles of abraded PTFE (easily revealed by polarized light) give rise to intense foreign-body reactions. Granulomatous masses form, and sometimes break down internally and produce collections of sterile "pus." Masses of amorphous white debris accumulate which can truly be called caseous and often reach 100–200 ml in volume. Chemical analysis shows that by dry weight it contains about 13% PTFE.
>
> In contact with bone this caseous material is slowly erosive, because no fibrous reaction seals it off from the bone....
>
> \* \* \* \* \* \*
>
> **There is obviously more in this subject than can be dealt with in a letter, but my immediate object is: (1) a warning against the use of PTFE where abrasion with the liberation of particles is likely....**

*See Jacobs* Jt.App. 353 (emphasis added).

Dr. John Leidholt, an orthopedic surgeon in Denver, Colorado, noted similar problems in his attempts in the mid–1960s to use PTFE as a joint prosthesis in the hip joints of dogs. Dr. Leidholt concluded that "[s]traight or unmodified Teflon proved to be unsuitable because of wear and deformation.... These findings indicate that Teflon should not be used in any part of a prosthesis in weight-bearing joints." *See Jacobs* Jt. App. 360 (John D. Leidholt et al., "Teflon Hip Prostheses in Dogs," 47–A *The Journal*

*of Bone and Joint Surgery* 1414, 1420 (1965)).[15]

Du Pont was aware of the works of both Dr. Charnley and Dr. Leidholt. In a letter dated February 21, 1966, from George A. Wilkens of Du Pont's Plastics Department to Dr. Leidholt, Mr. Wilkens stated the following:

> I do not feel that we are qualified to advise you with respect to the causes of the failure in the experiments you reported. However, from our industrial background it is recognized that "Teflon" is a relatively soft plastic and that wear and cold flow may be expected under certain conditions of mechanical loading and movement. It is not surprising that this type of behavior was observed by you. Your suggestion that the use of mechanical models operated under laboratory conditions would be effective in providing preliminary information prior to animal tests is indeed sound.
>
> \* \* \* \* \* \*
>
> **DuPont "Teflon" is not made for medical use. While we carry out such tests as are needed to protect the ordinary users of our products, we do not perform the detailed long-term studies which should be made before these products are employed for purposes such as medicine and surgery. Accordingly, we are reluctant to encourage the use of "Teflon" for surgical purposes.**
>
> \* \* \* \* \* \*
>
> Consequently, the propriety of the use of "Teflon" in so complex a mechanism as the human body is necessarily a medical question and must be resolved by medical opinion alone without any recommendation or representation by us.

*See Jacobs* Jt.App. 361–62 (emphasis added). As noted above, the dangers cited by Dr. Charnley and Dr. Leidholt, regarding PTFE's use in a load-bearing joint such as the hip, would manifest themselves again in the TMJ implant developed by Vitek.[16]

---

15. Dr. Leidholt also stated that "[c]onsideration might be given in future experiments to the use of modified Teflon, impregnated with glass, ceramic, steel or carbon." *See Jacobs* Jt.App. 360.

Du Pont correctly points out that Proplast was PTFE impregnated with carbon.

16. Du Pont correctly points out, however, that Drs. Charnley and Leidholt were not the only

## 2. Du Pont's Relationship With Dr. Homsy, 1959–84.

Dr. Homsy was a Du Pont employee from 1959 (immediately following his doctoral work at M.I.T.) to June, 1966. While at Du Pont, Dr. Homsy performed various technical tasks and also sold PTFE. On January 3, 1966, just prior to his departure, he wrote a memorandum to his supervisor and regional PTFE sales manager, D.E. Eells, entitled "Orthopedic Prosthesis of Polymeric Materials, Especially Fluorocarbon Resins, A Preliminary Venture Proposal." In that memorandum, Dr. Homsy proposed a venture for Du Pont's plastics department in which "initial business activity would focus on orthopedic prostheses, such as ball and cup hip joints, and other dynamic couplings within the human body, fabricated in part from [P]TFE and/or FEP resins." *See Jacobs Jt.App.* 540.[17] Dr. Homsy stated in the memorandum that he had spoken with George Wilkens regarding the "solid business dangers to Du Pont in endorsing their products for any medical use." *Id.*

Dr. Homsy's memorandum was passed on to Mr. Eells' supervisor, O.G. Youngquist. Mr. Youngquist responded that Du Pont would not get directly involved in the use of Teflon for prostheses:

The conclusion we have come to [in the past], and the conclusion I must now come to, is that the Plastics Department has no interest in embarking on a venture to fulfill this need. For one thing, I am sure it could be demonstrated that it would not be a profitable venture for DuPont. Above all, however, (and we have explored this aspect many times) we have not been given much encouragement from the Legal Department as to how we would face the consequences of the liability involved in operating in this area. For this reason alone, I am not willing to pursue this matter any further.

*See Jacobs* Jt.App. 543.[18]

In June, 1966, Dr. Homsy left Du Pont to pursue the development of what ultimately became Proplast. Before starting up Vitek, Dr. Homsy went to work for the Orthopedic Research Laboratory at Methodist Hospital in Houston, Texas, as its Coordinator for Prosthetic Devices. In March, 1967, Dr. Homsy advised Du Pont that Methodist Hospital would place an order for Teflon products for his research.

Mr. Wilkens of Du Pont responded with a letter addressed to the head of Methodist Hospital's purchasing department and copied to Dr. Homsy. In the letter, Mr. Wilkens stated the following: (1) Du Pont's Teflon was not made for medical use; (2) Du Pont had not conducted any studies on such usage; and (3) the relevant medical literature of the early 1960s had indicated that Teflon may not be well-suited to medical applications. Importantly, the letter specifically cited Dr. Charnley's study and noted that it "reported tissue reactions from abraded particles of [PTFE]." The letter went on to state that Du Pont conditioned the sale of PTFE to Methodist Hospital on the understanding that it was relying upon its own medical

---

ones to speak on the use of PTFE in load-bearing joints. In one article published in 1972, the author recommended the use of PTFE in a TMJ surgical application. He noted further, in an attempt to distinguish Dr. Charnley's article, that: "The [TMJ] is not, as in the case of the hip joint, under heavy load, and it was thought that a Teflon cloth in that situation would not fragment in the same way [as in Charnley]. Experimental evidence has confirmed this point." *See Jacobs* Jt.App. 267 (H.P. Cook, "Teflon Implantation in Temporomandibular Anthroplasty," 33 *Oral Surgery* 706, 707 (1972)).

17. Dr. Homsy had earlier authored a report entitled "Technology Concerning HS–10 Processing of Teflon TFE–Fluorocarbon Fine Powder Resins." In the report, he described a process for making complex fabricated articles with Teflon which was similar to the process for making Proplast outlined above. *See Jacobs* Jt.App. 486–509.

18. In accordance with the position outlined by Mr. Youngquist, Du Pont attached warning labels to two shipments of FEP film and one shipment of PTFE in 1966. All three warning labels stated the name of the Teflon product and then "Caution—Contains a new drug for investigational use only in laboratory research animals or for tests in vitro. Not for use in humans." *See Adelmann* Jt.App. 1103–04 (5/11/66 letter to Youens Eye Clinic, Columbus, Texas) (FEP); *Adelmann* Jt. App. 1121–22 (11/4/66 letter to Dr. Stolomon, Mt. Vernon, New York) (FEP); *Adelmann* Jt.App. 1123–24 (4/19/66 letter to University of Georgia School of Pharmacy, Athens, Georgia) (PTFE).

judgment, and not Du Pont's, in using this material for medical experiments and procedures. *See Jacobs* Jt.App. 544–45.[19] J.E. Pears executed a release to this effect on behalf of Methodist Hospital on April 25, 1967, and Du Pont shipped the PTFE to Dr. Homsy.[20] *Id.*

In a letter dated March 20, 1967, Dr. Homsy wrote to Du Pont's Mr. Wilkens and attempted to distinguish the negative literature cited by Wilkens in his letter to Methodist Hospital. With respect to Dr. Charnley's article, Dr. Homsy stated:

> Charnley's report of tissue reaction from abraded particles of [P]TFE, in the absence of comparative data, should rationally be ascribed to the mechanical form of the material and not the specificity of reaction to the [P]TFE polymer.... Charnley's use of unfilled [P]TFE for hip prostheses would naturally dispose of abrasive wear of the polymer. He will be here in April for a symposium on the "Painful Hip;" at that time, I hope to inquire further on his work.

*See Jacobs* Jt.App. 547. Dr. Homsy closed his letter by writing:

> Although it is clearly necessary for [Du Pont] to require disclaimers from medical

users of your products, it is regrettable that incomplete understanding of polymer applications has produced a literature which unfairly indicts [P]TFE polymer. It would be a major achievement of our work to place the medical application of this remarkable material on an unambiguous basis. The results should be measured in the alleviation of pain and disability in many people.

*Id.*[21]

Dr. Homsy was also aware of the Leidholt study as evidenced by a chapter he wrote in *Biocompatibility of Clinical Implant Materials* (David F. Williams ed. 1981) entitled "Biocompatibility of Perfluorinated Polymers and Composites of These Polymers." *See Jacobs* Jt.App. 277–98. *See also Jacobs* Jt. App. 161–62 (Homsy 6/6/92 deposition, pp. 186–87). In this chapter, Dr. Homsy questioned the experimental methods of Dr. Leidholt's work by noting that PTFE was used in conjunction with dissimilar metals, thus potentially contributing to the inflammation observed. Moreover, Dr. Homsy asserted that the PTFE was likely subject to contamination before placement in the hip joints, and that this contamination would further aggravate matters. *See Jacobs* Jt.App. 290.[22]

---

**19.** These warnings were reiterated to Dr. Homsy in subsequent correspondence from Du Pont to him. *See Jacobs* Jt.App. 549 (11/26/68 letter from Dr. Homsy to Du Pont requesting information on the qualities of various Teflon fibers); *Jacobs* Jt.App. 551 (1/2/69 response from Du Pont repeating its position that use of Teflon in medicine was entirely left to the discretion of medical professionals, and recommending to Dr. Homsy that he contact other Du Pont customers to receive the information requested).

**20.** The *Adelmann* Appellants also argue that Du Pont engaged in a policy of silence and disassociation by abandoning warning labels in favor of a disclaimer policy, such as that used with Methodist Hospital. This allegation, Appellants contend, is supported by the 1967 correspondence between Du Pont and Dr. Homsy which cites adverse literature on the medical use of Teflon products. As further evidence, Appellants point to an April 20, 1966 telephone call report made by Du Pont's J.A. Snider after he spoke with Lou Sommers of Intracorporeal Medical Specialties Company ("IMSC"), a Du Pont customer which used FEP tubing for a blood removal application. The call report states that IMSC was upset when it learned of Du Pont's disclaimer policy. IMSC was using Teflon for medical applications, and it

feared that if the FDA learned of the disclaimer policy it would take adverse action against IMSC. In addition, the call report urged Du Pont to give further advice to IMSC on its disclaimer policy. *See Adelmann* Jt.App. 1105–06.

**21.** At a deposition taken on February 5, 1992, Dr. Homsy gave three reasons for his belief that Charnley's study on the use of PTFE in the hip joint was distinguishable from his own work with the IPI. First, according to Dr. Homsy, Dr. Charnley did not operate under clean room conditions. Second, Dr. Homsy believed that the hip joint bore much more weight than the TMJ. Lastly, Dr. Homsy did not use pure PTFE as did Dr. Charnley (and Dr. Leidholt), but rather—as suggested by Dr. Leidholt—a compound material with PTFE. *See Jacobs* Jt.App. 102–03, 105 and 153–54 (Homsy 2/5/92 deposition, pp. 34–35, 37 and 104–05).

**22.** Du Pont cites Dr. Homsy's letter to Mr. Wilkens regarding Charnley and the chapter excerpt on Leidholt to show that Dr. Homsy was an expert in the use of plastics like PTFE and FEP for medical applications. In support of this contention, Du Pont also notes Dr. Homsy's extensive experience in the biomaterials field in terms

On October 5, 1972, John Ostroot, Du Pont's sales representative for the Houston market, conducted telephone interviews with Dr. Homsy and a Dr. J.N. (Bill) Tellkamp, who was also employed by the recently formed Vitek, in order "[t]o determine [the] status of Homsy's new business and discuss PFA [another form of Teflon]." *See Jacobs* Jt.App. 556. His written call report contained the following summary of the conversations: "Homsy's new 'TEFLON'/carbon implant material called 'PROPLAST' has been licensed to Smith, Kline & French and appears to have obtained acceptance in a wide range of human implant applications. Vitek will shortly be producing basic shapes of 'PROPLAST' to supply every hospital in the world." *Id.*

The next contact between Du Pont and Dr. Homsy contained in the record occurred on May 16, 1977, when Dr. Homsy, at the request of Dr. J.B. Armitage of Du Pont's Patents and Regulatory Affairs Division, executed a release prompted by recent amendments in federal food and drug laws affecting medical and surgical use of Du Pont's Teflon resins. Attached to the release was a "Statement of [Du Pont] Policy Regarding Medical or Surgical Uses of Plastic Polymers." The policy stated that Du Pont conditioned the sale of its Teflon products to those in the medical field on their assumption of responsibility for any medical usage of these products. This was because Du Pont: (1) designed Teflon for industrial purposes only; (2) did not make any medical or surgical grades of Teflon; and (3) had not conducted any of its own testing on Teflon's efficacy in medical applications. The release further conditioned sale of Teflon to medical institutions and professionals on their agreement to abide by all federal regulations. *See Jacobs* Jt.App. 574–75.[23] Dr. Homsy executed the release attached to the policy on May 16, 1977. In addition to the release, Dr. Homsy also sent Du Pont literature describing Proplast in various applications. *See Jacobs* Jt. App. 576–89.[24]

Thus, as of the early 1980s, Du Pont and Dr. Homsy had exchanged extensive correspondence in which Du Pont repeatedly warned Dr. Homsy that it made no promises on the medical efficacy of its Teflon products. Du Pont even went so far as to cite adverse literature to Dr. Homsy in its 1967 letter to him. Dr. Homsy nonetheless pursued the development of various medical applications using Teflon products, including the IPI.[25]

of teaching, writing, and research. *See Jacobs* Jt.App. 96–97 (Homsy 2/5/92 deposition, pp. 20–21) (noting Dr. Homsy's participation in the Rice–Baylor Artificial Heart Project); *Jacobs* Jt. App. 182–83 (Homsy 6/7/92 deposition, pp. 686–87), 186–87 (Homsy 6/7/92 deposition, pp. 690–91) and 303–17 (all noting Dr. Homsy's extensive teaching and writing in the field). It is unclear, however, if Du Pont knew all or part of the above about Dr. Homsy prior to this litigation.

23. Appellants contend that the disclaimers made by Du Pont from 1967 to 1977 apply only to PTFE and not FEP. These disclaimers, however, clearly make reference to *Teflon*, which includes both PTFE and FEP.

24. These applications did not include use as a meniscus replacement in the TMJ.

25. Appellants suggest that Du Pont could have easily conditioned the sale of PTFE (and FEP) on a promise by the purchaser to pass on warnings to end-users (which admittedly was not done with Vitek). In support of this position, Appellants point out that Du Pont did condition the sale of PTFE and FEP with another purchaser. In a July 20, 1984 letter to Carl Cox of Macfield

Texturing, J.P. Riley of Du Pont's Textile Department's wrote:

This letter is in response to your telephone call on July 17, 1984, in which we discussed the fact that you had been asked to prepare an elasticized yarn by wrapping an elastic yarn with a yarn of Teflon [P]TFE fluorocarbon resin for a customer. The customer plans to use this sleeve-type product in a medical application.

I made you aware of DuPont's position of neither recommending nor encouraging the use of their yarns in medical applications. If you agree to apprise your customer of this and you return this letter agreeing to your stipulation, I will arrange to have sent to you a package of 1200 denier natural Teflon yarn.

*See Adelmann* Jt.App. 1083.

Du Pont counters this argument by stating: Appellants claim that "in other medical sales" of Teflon, DuPont also required purchasers as a condition of sale to inform "subsequent purchasers and users" that Teflon was not made for medical applications (*See Adelmann* Op.Br. at 18). This, too, misstates the record. What happened was that on one occasion, involving one sale, to a purchaser *whose own customer was a medical device manufacturer*, DuPont required the purchaser to pass along the Du-

### 3. Du Pont's Increasing Knowledge Of The IPI In The 1980s.

On January 19–22, 1984, M.W. Bernhardt of Du Pont's Central Research and Development Department attended the annual meeting of the American Association of Oral and Maxillofacial Surgeons ("AAOMS"). At the time, Du Pont was interested in entering the biomaterials field. Dr. Homsy and representatives of the FDA also attended the conference.

In a memorandum dated February 1, 1984, Mr. Bernhardt reported that one of the speakers cited a study of 173 cases in which Proplast was used as a TMJ replacement. The study involved at least an eighteen month follow-up, and it stated that "[n]inety-three percent of patients reported at least some degree of improvement." See Jacobs Jt.App. 609.[26] In contrast, other papers delivered at the conference revealed that some oral surgeons had expressed dissatisfaction with TMJ replacement materials currently on the market, including Proplast. More specifically, these reports indicated that Proplast was difficult to remove from the TMJ because of a tendency to fracture, and that Proplast had the potential to deteriorate rapidly. See Jacobs Jt.App. 609–10, 612.[27]

Dr. Homsy was also one of the 1984 AAOMS speakers. According to Mr. Bernhardt's memorandum, he stated that Proplast "offers the advantages of being highly bio-compatible and porous enough to permit tissue ingrowth," and that "[s]tiffer implants can present an undesirable mechanical challenge to adjacent tissue leading to encapsulation by relatively avascular and acellular tissue and, finally, implant rejection." See Jacobs Jt.App. 611.

In a confidential AAOMS conference follow-up memorandum dated February 24, 1984, Mr. Bernhardt reported a meeting with Dr. Doran Ryan, one of the oral surgeons who presented (on a topic other than the IPI) at the AAOMS conference. Dr. Ryan worked with Dow Corning Company to develop the chief competitor of Proplast, Silastic. Mr. Bernhardt learned from Dr. Ryan that the meniscus which Vitek's IPI replaced "has tremendous load-bearing and shock-absorbing functions due to chewing motion and muscle forces acting on the TMJ." [28] See Jacobs Jt.App. 841. Mr. Bernhardt also reported that Dr. Ryan had switched to using Proplast from Silastic, even though he was unsure how long the wear surface layer in the IPI would last and despite his knowledge that Proplast would be difficult to remove. See Jacobs Jt.App. 844.[29]

In 1985–86, Vitek and Du Pont discussed the possibility of a joint venture. Appellants and Appellee, however, dispute the significance of the joint venture discussions. With respect to a Du Pont memorandum rejecting

Pont disclaimer to the device manufacturer-customer.... This was consistent with Du-Pont's policy that *medical device manufacturers* such as Vitek should understand and acknowledge their responsibility for assuring the safe medical use of DuPont's plastic raw materials. *See* Du Pont's *Adelmann* Brief, p. 10 n. 5 (emphasis in original). We note that the letter in question does not so clearly suggest that the ultimate consumer of the Teflon product was a medical *manufacturer* rather than, say, a doctor or hospital.

26. The same speaker who reported this study also noted that "[a]dvantages to Proplast include: inert, promotes tissue ingrowth, is easily shaped, easily compressible, low friction due to Teflon surface." *See* Jacobs Jt.App. 609.

27. Even these negative reports, however, were not always entirely negative. The physician who noted that Proplast in the TMJ has a tendency to disintegrate, also stated with respect to Proplast that "[s]tabilization is good—decrease migration.

Is also ultra-porous, has low friction and high wettability." *See* Jacobs Jt.App. 612.

28. Appellants point out that it was known in 1972 (and had been suggested as early as the 1950s) that the TMJ was a load-bearing joint. In a 1972 *Biomechanics* article entitled "The Biomechanics of the Temporomandibular Joint: A Theoretical Study," the author concluded that "[t]he analysis presented, which employs experimentally determined lines of muscle action, indicates that the [TMJ] is load-bearing during function." *See Adelmann* Jt.App. 828 (also referencing earlier studies conducted in the 1950s suggesting the same result). There is no evidence that Du Pont was aware of this study upon its issuance.

29. Appellants in *Adelmann* submitted a list to the district court indicating when each of them were treated and received the IPI. The named Appellant, Ms. Adelmann, did not receive her implant until 1987. Only three of the twenty-five who

the joint venture, Appellants state the following:

> In January of 1986, DuPont's Central Research and Development Department (by R.S. Mallouk) considered a possible joint venture relationship with Vitek but warned DuPont's management (J.L. Fought in "Biomedical") that the Proplast implant " 'may be intrinsically inadequate because it is too soft, crushable and shearable. The prosthesis is likely to subside, they feel, resulting in loosening, generation of loose PTFE and filler particles, macrophage accumulation and inflammation.' " R. 116. Based upon these unfavorable reports regarding Proplast and its own concern about liability, DuPont rejected Vitek's offer of a joint venture. *Id.*

See *Adelmann* Appellants' Brief, p. 17.

In contrast, Du Pont interprets the Mallouk memorandum as follows:

> Appellants' note that [in 1986], well after many of them had received their TMJ implants ..., DuPont turned down a joint venture with Vitek. Appellants' discussion of the memorandum concerning this event ... is incorrect and misleading. First, the memorandum indicates that Vitek's lack of marketing strength was the ground for declining the joint venture. Second, plaintiffs fail to inform the Court that the possible joint venture and the memorandum itself related to a *hip* product and had

nothing to do with TMJ implants; Vitek and DuPont never discussed TMJ implants....[30] Finally, Appellants fail to provide the memorandum's full context, including its statement that Vitek's hip prosthesis "works well" if fitted correctly and its characterization of Dr. Homsy as a "knowledgeable" entrepreneur/scientist....

See Du Pont's *Adelmann* Brief, pp. 15–16 n. 9 (emphasis in original).

In 1989, Du Pont issued a publication on the wearing of Teflon. This publication states that one of the twelve variables affecting wear is load. See *Jacobs* Jt.App. 808. The publication goes on to specifically say that "[d]uring the process of wear, debris is formed, consisting of particles of filler, of Teflon, and of the mating surface." See *Jacobs* Jt.App. 810. It is this debris from the IPI which caused Appellants' injuries.[31]

Despite increased knowledge of the problems associated with the IPI, there is no evidence in the record regarding what safety warnings, if any, were given by Vitek to purchasers of the IPI.[32] At oral argument in the *Jacobs* appeal, counsel for Du Pont made an uncontested representation that sometime in 1985 Vitek began placing product inserts in its IPI packages which warned of possible implant fragmentation and consequent foreign-body reactions. Apparently, these

---

joined in *Adelmann* received their implants before Mr. Bernhardt's memos in February, 1984.

30. This statement is supported by an excerpt from one of Dr. Homsy's depositions. See *Adelmann* Jt.App. 481 (Homsy 6/6/92 deposition, p. 187).

31. Appellants in *Adelmann* submitted an affidavit by Dr. John Fellers, Ph.D., of the University of Tennessee's Material Science and Engineering Department. Importantly, Dr. Fellers concedes that "Teflon is not by itself *per se* defective." See *Adelmann* Jt.App. 243. However, he concludes after a review of the literature and the record in this case that "Teflon's usage in a load-bearing setting such as in a joint or under friction within the human body ... makes Teflon an unreasonably dangerous and defective product in my opinion." *Id.* Dr. Fellers also stated that he would testify that "DuPont was negligent in the manner it conducted itself in this case by selling Teflon in the manner it did without adequate warnings and without adequate assurance that the dangers and characteristics of Teflon would

be fully disclosed to subsequent purchasers and customers." *Id.* at 243–44.

32. A March 1, 1977 flier entitled "Proplast Stabilized TMJ Prosthesis ( [TMJ] Condylar Prosthesis)," which was supplied to Du Pont when Dr. Homsy executed the 1977 release, did, however, contain the following "Precaution:"

> The long-term safety and efficacy of any synthetic implant material are not known since the results of implantation in humans followed through an entire life cycle are not yet available. This fact should be explained to patients considered for synthetic implants. However, it should also be noted that when carbon and implantable polymers were compared in sensitive *in vitro* tests involving cell culture experiments and infrared analysis, that carbon and Teflon are among the least reactive and most biocompatible of those materials (C.A. Homsy, *Journal of Biomedical Materials Research* 4:341, 1970).

See *Jacobs* Jt.App. 578. This flier did not refer to the IPI; rather, it spoke of Proplast's use to replace part of the condylar, or jaw bone.

product inserts also made reference to a 1984 oral surgery report noting the abradability of the IPI. An excerpt from Dr. Homsy's deposition, cited in the *Adelmann* appeal, indicates that Vitek did have a product insert generated by Dr. Kent, Vitek's chief consultant on the IPI. *See Adelmann* Jt.App. 733–35 (Homsy 6/1/88 deposition, pp. 141, 143–44). It is uncertain, however, exactly what the disclaimer stated.[33]

## III. THE DISTRICT COURT OPINIONS

The district court summary judgement opinions in both *Jacobs* and *Adelmann* deal primarily with Appellants' duty to warn claims. In *Jacobs,* the district court held that Ohio law does not place a duty upon component parts manufacturers to warn end-users of the dangers posed by incorporation of component materials into a finished product. (*See Jacobs* Jt.App. 77–80). Alternatively, the district court found that Du Pont discharged any duty to warn by passing on to Dr. Homsy and Vitek detailed warnings and disclaimers concerning Teflon's use in medical devices. (*See Jacobs* Jt.App. 81–82).

In contrast, the *Adelmann* district court, after reviewing Tennessee decisional precedent, found that Du Pont did have a duty to warn end-users of the known dangers of Teflon's use in medical applications. However, the district court held that Du Pont discharged this duty by delivering warnings to Dr. Homsy and Vitek. (*See Adelmann* Jt. App. 41–49) (relying upon *Whitehead v. Dycho Co., Inc.,* 775 S.W.2d 593 (Tenn.1989) and *Byrd v. Brush Wellman, Inc.,* 753 F.Supp. 1403 (E.D.Tenn.1990)).

In both cases, the courts rejected Appellants' defective design and manufacture claims. More specifically, in *Jacobs* the court stated that Appellants "had offered no evidence that abrasion or other adverse characteristics of the TMJ implant are due to Teflon itself, rather than to Teflon's incorporation into the implant." (*See Jacobs* Jt.App. 77). Under these circumstances, the court

concluded that Ohio law would not permit recovery under a design/manufacture defect theory. Similarly, the *Adelmann* court found that, at the time of their design, Du Pont had no intent to use PTFE and FEP outside the industrial context. (*See Adelmann* Jt.App. 49–50).

The *Adelmann* district court also rejected the remaining claims made by Appellants in that case. According to the court, Appellants' express warranty and fraud arguments were meritless because there was no evidence that Du Pont ever made any representations regarding Teflon's use in the IPI. (*See Adelmann* Jt.App. 51–52). Furthermore, the district court rejected Appellants' claim of breach of the implied warranty of merchantability on the grounds that Teflon's inclusion in the IPI was not an ordinary usage. (*See Adelmann* Jt.App. 52–53). Finally, the district court denied Appellants' request to amend their complaint to allege a breach of the implied warranty of fitness for a particular purpose, since the record showed that Dr. Homsy, not Du Pont, selected the goods based upon superior knowledge. (*See Adelmann* Jt.App. 53–54).

## IV. THE PARTIES' ARGUMENTS ON APPEAL

### A. JACOBS APPELLANTS

The Appellants in *Jacobs* argue for reversal on the grounds that Du Pont failed to meet its duty to warn end-users of the dangers associated with the IPI, even after it acquired knowledge of those dangers in early 1984—well before Ms. Jacobs received her implant in 1985. Appellants view the duty to warn end-users in this case as non-delegable. Furthermore, Appellants allege that even if Du Pont only had a duty to warn Vitek, "the District Court clearly erred in granting summary judgement where there were factual questions as to [ ]: (1) [whether] Dupont could reasonably rely upon Vitek to warn the ultimate users of FEP and PTFE; (2) [whether Dupont's] self-protective disclaimer

---

**33.** According to Dr. Homsy's deposition, in 1985 Dr. Kent "recommended that we caution against the possibility of fragmentation from overloading of the implant." *See Adelmann* Jt.App. 733 (Homsy 6/1/88 deposition, p. 141). Dr. Homsy

further stated that he understood "overloading" to occur when "[t]he forces through the TMJ joint become totally abnormal." *Id.* It is unclear if such a warning went into the IPI packaging.

was really an adequate warning as to PTFE; (3) whether no warning of any kind was adequate as to FEP; and (4) whether 'warnings' given in 1967 and 1977 were adequate given Dupont's increased awareness of Homsy's folly in 1984." (*See Jacobs* Appellants' Brief, p. 31). Finally, Appellants contend that Du Pont is strictly liable for the injuries caused by PTFE and FEP because they were defective for their known use in the IPI, or at least that questions of material fact exist on this issue with respect to "the alteration of PTFE and FEP, the extent of Du Pont's knowledge concerning the dangers of PTFE and FEP, [and] the foreseeability of the product's use and Vitek's intended use." (*See Jacobs* Appellants' Brief, p. 27.).

### B. *ADELMANN APPELLANTS*

The Appellants in *Adelmann* offer four reasons for reversal of the district court's grant of summary judgment. First, Appellants state that summary judgment was based on grounds outside of Du Pont's motion. Second, Appellants contend that they did not have an opportunity to conduct adequate discovery regarding whether Du Pont met its duty to warn Vitek. Next, Appellants state that material issues of fact exist on the question of whether Du Pont fulfilled its duty to warn Vitek. Finally, Appellants argue that material issues of fact exist on the remaining claims: (1) breach of express warranty; (2) fraud; (3) breach of the implied warranty of merchantability; and (4) breach of the implied warranty of fitness for a particular purpose.

### C. *DU PONT*

In *Jacobs*, Du Pont argues that the district court judgment should be affirmed in its entirety. In *Adelmann*, Du Pont counters Appellants' contention that summary judgment was prematurely granted by pointing to the size of the record and the extent to which both parties raised and argued the bulk supplier/sophisticated intermediary rule upon which the district court granted summary judgment. Du Pont also asserts that the district court correctly applied the bulk supplier/sophisticated intermediary rule in granting its motion. Furthermore, Du Pont argues that summary judgment was proper on the additional, independent grounds that Du Pont, as a supplier of raw materials to a finished product manufacturer, had no duty in the first place to warn end-users of any dangers posed by use of its materials in a finished product. Lastly, Du Pont claims that it cannot be held liable under breach of warranty or fraud claims because it did not make false material statements on which any party relied, and because it expressly disclaimed any knowledge or liability for Teflon's use in medical applications.

Moreover, in both *Jacobs* and *Adelmann*, Du Pont argues that it would be "anomalous and improper" to impose a duty to warn end-users about a finished medical product on a raw material supplier because federal regulatory and state common law already place that duty upon the product manufacturer, and that the 1976 Medical Device Amendments to the Food, Drug and Cosmetic Act preempt Appellants' state law claims.

### V. *ANALYSIS*

### A. *THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.*

We review a district court's grant of summary judgment *de novo.* *See, e.g.,* *Zettle v. Handy Mfg. Co.,* 998 F.2d 358, 360 (6th Cir.1993). Affirmance is proper only if there are no material issues of fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Importantly, in deciding whether to affirm the district court, we must view the record in the light most favorable to the non-moving party. *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991), *cert. denied,* 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992).

### B. *APPELLANTS' CLAIMS ARE NOT PREEMPTED BY THE MEDICAL DEVICE AMENDMENTS OF 1976.*

As a threshold issue, in both *Jacobs* and *Adelmann*, Du Pont argues that the 1976 Medical Device Amendments (MDA) to the Food, Drug and Cosmetic Act preempt Appellants' state law claims. This circuit has yet to rule on the preemptive force of this

act, but virtually all courts that have considered the issue agree that state product liability claims based on medical devices specifically classified and regulated by the FDA under the MDA scheme are preempted. *Compare, e.g., Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15–20 (1st Cir.1994) (holding that the product liability claims against the manufacturer of a pacemaker classified by the FDA were preempted); *Slater v. Optical Radiation Corp.,* 961 F.2d 1330, 1334 (7th Cir.) (holding that the defective design claim against the manufacturer of intraocular lens subject to FDA investigational device exemption regulations was preempted), *cert. denied,* —— U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992); *and Kemp v. Pfizer, Inc.,* 835 F.Supp. 1015, 1019–23 (E.D.Mich. 1993) (holding that the product liability claims against the manufacturer of an FDA-classified medical device were preempted) *with, e.g., Mulligan v. Pfizer, Inc.,* 850 F.Supp. 633, 636 (S.D.Ohio 1994) (holding that the MDA does not preempt product liability claims against a prosthetic knee device manufacturer).

We need not rule today on the entire scope of MDA preemption. It is sufficient for the purposes of this opinion to resolve the question of whether such preemption exists in this case.

We have found only two cases which have addressed the specific argument of whether a supplier of raw materials used in a medical device can invoke MDA preemption. *See Lamontagne v. E.I. Du Pont de Nemours & Co.,* 834 F.Supp. 576 (D.Conn.1993), *aff'd,* 41 F.3d 846 (2d Cir.1994); *and Anguiano v. E.I. Du Pont de Nemours & Co.,* 44 F.3d 806 (9th Cir.1995). Those cases also involve the identical facts and claims before us in this case. We find the reasoning expressed in *Lamontagne* and *Anguiano* sound, and, therefore, reject Du Pont's preemption argument.

The *Lamontagne* court began its legal analysis by citing the statutory provision on which Du Pont relies to claim preemption:

> [N]o state or political subdivision of a State may establish or continue in effect with respect to any device intended for human use any requirement—

> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

> (2) which relates to the safety and effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

*See* 21 U.S.C. § 360k(a). The court then noted that the FDA has interpreted this section as preempting "any requirements established by a state including statutes, regulations, court decisions, or ordinances." *See* 21 C.F.R. § 808.1(b). Thus, the court concluded that so long as § 360k(a) applied to Du Pont's supply of raw materials for the IPI, plaintiffs' state law claims would be preempted. *See* 834 F.Supp. at 582.

The court next held, however, that § 360k(a) did not preempt plaintiffs' state law causes of action because FDA regulations limited the scope of preemption to regulated devices, and the IPI implants were never subject to regulations specific to that product. The court noted that 21 C.F.R. § 808.1(d) states:

> State or local requirements are preempted only when the Food and Drug Administration has established *specific counterpart regulations or there are other specific requirements applicable to a particular device* under the act, thereby making any existing divergent State or Local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

*See* 834 F.Supp. at 582–83 (emphasis added in *Lamontagne* ). From this the court concluded:

> In other words, FDA regulations provide that "preemption does not apply when the FDA has issued no regulations or other requirements specific to the particular device." *King* [*v. Collagen Corp.*], 983 F.2d [1130,] 1134 [ (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993) ].... Accordingly, a plaintiff's state law tort claim is preempted only if (1) the FDA has established regulations specific to the medical device at issue in the particular case; (2) the state law claim constitutes a requirement different from, or in addition to, any requirement the

FDA has made applicable to the device at issue; and (3) the claim relates to either the safety or effectiveness of the device or to any other matter included in a requirement made applicable to the device by the MDA.

See 834 F.Supp. at 583.

The *Lamontagne* court then stated:

Although, as discussed below, DuPont has shown that the FDA had issued regulations specific to the Proplast material that was used to make the implants received by the plaintiffs, *preemption under § 360k is not appropriate in the instant case because DuPont has failed to demonstrate that the FDA issued regulations specific to the Proplast TMJ Implant—the specific device which allegedly harmed the plaintiffs—as required by the FDA regulations implementing 360k.*

See 834 F.Supp. at 583 (emphasis added). After reviewing the evidence regarding FDA regulation of Proplast in general and the IPI in particular, and after noting that the FDA never issued regulations on the IPI but, rather, only classified it in 1992—long after plaintiffs had received their devices in 1985–86—the court concluded:

The evidence produced by the plaintiffs thus suggests that the Proplast TMJ Implants received by the plaintiffs were not classified by the FDA until *after* the plaintiffs received them, nor did the FDA ever issue any regulations *specific to* the Proplast TMJ Implant. DuPont has offered no evidence to the contrary. Accordingly, the defendant has failed to meet the requirements of the regulations under § 360k for preemption of the plaintiffs' claims and summary judgment on this ground is inappropriate.

See 834 F.Supp. at 585 (emphasis in original). See also *Anguiano,* 44 F.3d at 809–10 (rejecting MDA preemption because the FDA had issued merely classifying, rather than specific, regulations regarding PTFE).

The *Lamontagne* court then moved on to reject another ground for preemption based on an FDA regulation which exempts "[a] manufacturer of raw materials or components to be used in the manufacture and assembly of a device" from the registration requirements of the MDA "because the Commissioner has found ... that such registration is not necessary to ensure the public health." See 21 C.F.R. § 807.65.[34] These registration requirements include supplying the FDA with a copy of the warnings and labelling that accompany the final medical device.

The court held that claims against raw material suppliers were not preempted simply because of their status as raw material suppliers for several reasons. First, Du Pont cited no authority for such a proposition. Second, the court did not believe that preemption existed simply because Congress chose not to regulate raw material suppliers. Indeed, Congress' decision not to "occupy the field" of raw material supplier regulation suggested to the court that it did not intend for state regulations to be barred. See 834 F.Supp. at 585–86.

The court continued along these lines by stating:

Moreover, the defendant's argument that state requirements imposed by the theories of liability that underlie the plaintiffs' claims (such as the imposition of a state law duty to warn) would contradict the MDA finds no support in the statute. The court knows of no provision of the MDA or the regulations thereunder which states that manufacturers of raw materials *shall not* be regulated. Rather, the FDA has simply determined that for its own purposes such regulation is unnecessary.... State law requirements, to the extent that they govern the conduct of such "manufacturers of raw materials," thus will not run afoul of any express provision of the MDA or any pronouncement of the FDA.

See 834 F.Supp. at 586 (citation omitted). The court ended its analysis by concluding that Du Pont was not entitled to a finding of preemption under either of its theories:

---

**34.** *See also* 21 C.F.R. § 807.81(a) & 807.87(e) (exempting those who need not register with the FDA, including raw material suppliers, from obtaining clearance for, and approval of, any prod-uct warnings or labels); 21 C.F.R. § 820.1 (exempting suppliers of components or parts in medical devices from the FDA's manufacturing practices regulation).

Accordingly, it is clear that the plaintiffs' state law claims against DuPont are not preempted by the federal scheme for the regulation of medical devices. The FDA established no "specific counterpart regulations" or "specific requirements applicable to" the Proplast TMJ Implant at issue in this case. Nor does the fact that the FDA has elected not to regulate "manufacturers of raw materials" used in medical devices support federal preemption of state requirements applicable to such raw material manufacturers. The defendant is thus not entitled to summary judgment based upon federal preemption of the plaintiffs' claims.

*See* 834 F.Supp. at 586.

We believe that the *Lamontagne* court's analysis is correct. It is undisputed that the FDA never issued regulations specific to the IPI, or even classified this device, until years after Ms. Jacobs received her implants in 1986. The preemptive force of the MDA, then, never applied to the IPI. Similarly, with respect to Du Pont's raw material supplier argument, the preemption provision in the MDA speaks only of *medical devices,* not raw materials. Moreover, the exemption in FDA regulations stating that a raw material manufacturer need not comply with that agency's requirements cannot also be read to say that federal law eliminates the applicability of any common law duties, including the duty to warn. We hold, therefore, that § 360k preemption does not provide a basis for affirming the district court's grant of summary judgment.[35]

Having held that Appellants' claims are not preempted by § 360 of the MDA, we turn now to the substantive issues presented in *Jacobs* and *Adelmann.*

### C. *JACOBS v. DU PONT*

#### 1. *The district court properly granted summary judgment under the "component parts" doctrine.*

 Ohio law is settled that a component part manufacturer has no duty to warn end-users of the finished product of the potentially dangerous nature of its parts in that product. In *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 364 N.E.2d 267 (1977), the Ohio Supreme Court held that the supplier of operating buttons in a power press, which when assembled and modified by third parties caused serious injuries to the plaintiff, did not have a duty to warn end-users of the dangers posed by the inclusion of those buttons in the final power press. In the court's words:

> In our opinion, the obligation that generates the duty to warn does not extend to the speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous dependent on the integration into a unit designed and assembled by another. Because of the limited contact [with the power press manufacturer] there is no indication that [the operating button supplier] could have known that its components were to be fashioned or fabricated into the power press in the particular manner that they were.

*See* 364 N.E.2d at 272. *See also Searls v. Doe,* 29 Ohio App.3d 309, 505 N.E.2d 287, 290 (1986) ("[D]efendants, as manufacturers of component parts, had no duty to warn plaintiff of a potentially dangerous or defective design of a [beer can ejection system] where defendants were not responsible for the design and manufacture of the entire system and where the component parts, not in and of themselves dangerous or defective, were manufactured in accordance with [the purchaser/manufacturer's] specifications."). *Cf. Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 49 (6th Cir.1989) ("[A] component supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its non-defective component part.").

In response to the rule announced in these cases, Appellants rely principally upon *Miles*

---

**35.** We believe that the foregoing analysis also addresses Du Pont's argument that it would be "anomalous" to impose a duty to warn upon Du Pont when federal regulatory law places this duty upon medical device manufacturers. We understand this argument to be, simply, a "softer" statement of Du Pont's preemption argument.

*v. Kohli & Kaliher Assocs., Ltd.,* 917 F.2d 235 (6th Cir.1990). We believe that this case is distinguishable. In *Miles,* the component part supplier of bridge materials also drafted the design of the finished product—the bridge. Thus, it was appropriate in that case to hold that the supplier had a duty to warn end-users of the dangers of that product, since it had superior knowledge of those dangers. *See* 917 F.2d at 245. Here, Du Pont had no role in the development of the IPI, and, despite its increased knowledge of the device after Mr. Bernhardt's investigation, it is clear that Vitek was always in a better position than Du Pont to assess the risks of the IPI.

None of the other cases on which Appellants rely to show that Du Pont breached the duty to warn attributable to component part manufacturers alters our conclusion. In *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107 (3d Cir.1992), *cert. denied sub nom. Doughboy Recreational Inc., Div. of Hoffinger Indus., Inc. v. Fleck,* —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993), the Third Circuit, applying Pennsylvania law, found that the manufacturer of a replacement pool liner was strictly liable for a failure to attach warning labels stressing the dangers of diving into a shallow pool. The pool liner manufacturer argued that he was only the supplier of a component part and should not be expected to foresee the dangers of diving into a shallow pool. The Third Circuit rejected this argument on the basis that a pool liner has but one use—to line a pool—and that the manufacturer, therefore, could easily foresee the dangers of failing to affix warning labels. *See* 981 F.2d at 117–19. The *Fleck* court specifically distinguished the situation before it from the one presented here; namely, where plaintiffs seek to impose a duty to warn about a specific application of a product, like Teflon, which has many different uses. *See* 981 F.2d at 118.

In another case cited by Appellants, *Beauchamp v. Russell,* 547 F.Supp. 1191 (N.D.Ga. 1982), the district court denied summary judgment to a component part manufacturer of an air valve used in a food can casemaking device. The record at that point in the case indicated that the air valve manufacturer did not supply instructions or warnings to the can casemaker manufacturer about the use of its air valve and of the need to ensure an air-pressure release mechanism. Such instructions and warnings were common in the air-valve industry. *See* 547 F.Supp. at 1197–98. *See also Suchomajcz v. Hummel Chem. Co.,* 524 F.2d 19, 27 (3d Cir.1975) (denying summary judgment to a component part supplier of chemicals used to make fireworks in part because the supplier did not provide any warnings to the fireworks manufacturer). Here, of course, Du Pont did bring to Dr. Homsy's attention Dr. Charnley's adverse study of the use of PTFE in a load-bearing joint, and it also repeatedly stated to Vitek that it was up to the medical community to determine the extent of safe prosthetic applications of Teflon.

Appellants also cite two Illinois asbestos cases in support of their contention that a component part supplier has a duty to warn end-users of the dangers of its products. The first, *Hammond v. North Am. Asbestos Corp.,* 97 Ill.2d 195, 73 Ill.Dec. 350, 454 N.E.2d 210 (1983), affirmed a jury verdict for a plaintiff who had suffered injury as a result of handling raw asbestos manufactured by defendant. Crucially, the raw asbestos was sold to plaintiff's employer without warnings of dangers known to defendant. *See* 73 Ill. Dec. at 357, 454 N.E.2d at 217. Thus, *Hammond* is not instructive in the instant case when one considers that Du Pont warned Vitek of all of the hazards that it knew of concerning the medical applications of its product.

The second Illinois case, *Board of Educ. of City of Chicago v. A, C & S, Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989), is also distinguishable. The procedural posture in that decision was quite different from this one in that defendants, a number of asbestos manufacturers and suppliers, sought a dismissal of the complaints for failure to state a claim. In addition, the issue in *A, C & S* was simply whether asbestos placed in school buildings was a "product" for purposes of application of strict products liability law. The Illinois Supreme Court found that asbestos was indeed a product because that finding "will effectuate the policy basis for

imposing strict liability in tort." *See* 137 Ill.Dec. at 646, 546 N.E.2d at 591. That court went on to deny defendants' motion to dismiss because plaintiffs had on the face of their complaints stated an actionable claim. 137 Ill.Dec. at 646, 546 N.E.2d at 591. Here, it is undisputed that Du Pont's Teflon products are items subject to product liability analysis. Moreover, the summary judgment record in this case is far more developed than the pleadings before the *A, C & S* court, and that record indicates that a reasonable jury could only find for Du Pont. *A, C & S,* then, adds nothing to the present inquiry.

Consequently, we hold that the district court properly applied Ohio's "component parts" doctrine in reaching its conclusion that Du Pont had no duty to warn end-users of the potential problems arising from the use of Teflon products in the IPI.

2. *Even assuming that Du Pont had a duty to warn end-users, this duty was fulfilled by application of the "bulk-supplier/sophisticated intermediary" rule.*

◼ Similarly, we believe that the district court properly held that Du Pont discharged any potential duty to warn by informing Dr. Homsy and Vitek of the known dangers of using Teflon in medical applications.

Section 388 of the Restatement (2d) of Torts, which both parties agree controls the inquiry into Du Pont's fulfillment of any duty to warn, states:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it was supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment n to this section explains in detail the scope of the above duty when there is an intermediary between the supplier of chattels and their end-users. This comment reads as follows:

*Warnings given to third persons.* Chattels are often supplied for the use of others, although the chattels or the permission to use them are not given directly to those for whose use they are supplied.... In all such cases the question may arise as to whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character.

Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.

The comment then goes on to describe some of the factors that courts should consider in determining if a product supplier can reasonably rely on a third party to pass on warnings:

These circumstances include the known or knowable character of the third person and may also include the purpose for which the chattel is given. Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so. If the chattel is one which if ignorantly used contains no great chance of causing anything more than some comparatively trivial harm, it is reasonable to permit the one who supplies the chattel through a third person to rely upon the fact that the third person is an ordinary normal man to whose discredit the

supplier knows nothing, as a sufficient assurance that information given to him will be passed on to those who are to use the chattel.

If, however, the third person is known to be careless or inconsiderate, or if the purpose for which the chattel is to be used is to his advantage and knowledge of the true character of the chattel is likely to prevent its being used and so to deprive him of this advantage—as when the goods are so defective as to be unsalable are sold by a wholesaler to a retailer—the supplier of the chattel has reason to expect, or at least suspect, that the information will fail to reach those who are to use the chattel and whose safety depends upon their knowledge of its true character. In such a case, the supplier may well be required to go further than to tell such a third person of the dangerous character of the article, or, if he fails to do so, to take the risk of being subjected to liability if the information is not brought home to those whom the supplier should expect to use the chattel.... Even though the supplier has no practicable opportunity to give this information directly and in person to those who are to use the chattel or share in its use, it is not unreasonable to require him to make good any harm which is caused by his using so unreliable a method of giving the information which is obviously necessary to make the chattel safe for those who use it and those in the vicinity of its use.

The comment continues by stating:

[I]f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means

of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them....

█ In applying § 388 and its commentary to this case, we must decide as an initial matter whether Appellants correctly contend that Du Pont's duty to warn end-users was non-delegable. We believe that this argument misreads comment n, which clearly permits a supplier of chattels to rely upon a learned intermediary in certain circumstances. *See also Adkins v. GAF Corp.*, 923 F.2d 1225, 1230 (6th Cir.1991) (applying Ohio law) ("Comment n to section 388 states that the supplier's duty to warn may be discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects."). We therefore hold that, in certain circumstances, a supplier of chattels can effectively delegate the duty to warn end-users to a third-party intermediary.

█ We also believe that Du Pont reasonably relied upon Vitek to pass on warnings of PTFE and FEP's possible unsuitability for use in load-bearing joints—a warning which Du Pont gave to Dr. Homsy as early as 1967 by citing Charnley's study to him and by stating that the medical efficacy of Du Pont's Teflon products remained highly uncertain. It is indisputable that Vitek, as the manufacturer of the finished product, had both a statutory and common law duty to warn end-users of the pitfalls of its finished medical device. *See* 21 U.S.C. § 352(f); *Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670, 671 (8th Cir.1985)). Equally irrefutable is the fact that Vitek had superior access to the oral surgeons and patients who used its IPIs. Moreover, although it is unclear if Du Pont knew all about Dr. Homsy that is currently known, it is manifest from his time with Du Pont, his correspondence with Du Pont after he left, and Mr. Bernhardt's notes, that Du Pont recognized Dr. Homsy as a leader in the field of using plastics in medical applications.

This case, then, is legally indistinguishable from *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.) (applying Ohio law), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). In that case, plaintiff, a General Motors employee, sued Union Carbide, a chemical manufacturer which sold a dangerous chemical (TDI) to GM, for failure to warn her and other GM employees of the hazards of that chemical. We held in *Adams* that the district court properly granted Union Carbide summary judgment because it discharged its duty to warn, pursuant to § 388 of the Restatement, by providing GM with detailed warnings of TDI's effects and suggestions on how to avoid them. Specifically, we stated:

> The fact that GMC repeatedly updated its information about TDI from Union Carbide, coupled with the fact that GM itself had a duty to its employees to provide them with a safe place to work, supports the inescapable conclusion that it was reasonable for Union Carbide to rely upon GMC to convey the information about the hazardous propensities of TDI to its employees within the context of comment n of the Restatement.

*See* 737 F.2d at 1457.

The same kind of facts are present in this case. Du Pont warned Dr. Homsy and Vitek of what it knew regarding the dangers of using Teflon products in load-bearing joints, and Vitek had a clear duty under law to provide all necessary warnings applicable to its IPI. As in *Adams*, then, the relevant product manufacturer in this case, Du Pont, fulfilled its duties under § 388.[36]

Appellants contend that Dr. Homsy demonstrated a complete inability to heed the dangers that the Vitek IPI posed and that, therefore, Du Pont unreasonably relied upon him to warn end-users of Teflon's inefficacy in load-bearing situations. Appellants rely primarily upon Dr. Homsy's attempts in various writings to rebut the findings in the Charnley and Leidholt studies in making this argument.

The record, however, demonstrates that Dr. Homsy's writings were an effort to *distinguish* these studies, not disregard them. His correspondence to Du Pont and professional writings explicitly noted the experimental contrasts between his work and that of Drs. Charnley and Leidholt. Furthermore, Dr. Homsy carefully developed means and methods to address the concerns raised in those studies in creating Vitek's prostheses. For example, he did not use raw PTFE in any of his applications, but, rather, manufactured Proplast with PTFE combined with salt and carbon or aluminum oxide fibers. Similarly, Dr. Homsy added a lamination of FEP film to the Proplast so that it would not come in direct contact with adjoining surfaces. Du Pont was aware of these changes by 1984, and it also knew at that time that the IPI was a widely used medical device which had been approved, at least for marketing, by the FDA.

Du Pont, then, had substantial grounds on which to reasonably rely on Dr. Homsy and

---

**36.** We should add that this case is also dissimilar to another one of our § 388 decisions interpreting Ohio law, *Adkins v. GAF Corp., supra.* In *Adkins*, the district court entered judgment on a jury verdict against an asbestos manufacturer (ACL) for injuries suffered by a Celotex employee. Celotex was the purchaser of the asbestos from ACL.

ACL argued that it should be discharged from any duty to warn liability because it relied upon a sophisticated purchaser (Celotex) to pass on warnings. We rejected this contention because the proofs showed (1) that ACL did *not* pass on any warnings to Celotex, (2) that ACL could have easily packaged their unchanged product with a warning to Celotex's employees, and (3) that ACL was familiar with Celotex's plant and, therefore, knew exactly how its employees were being exposed. Given these proofs, and ACL's knowledge of the dangers that its products posed from its own research, we concluded that it was unreasonable for ACL to rely on Celotex to pass on warnings even though Celotex, too, was aware of the dangers. · *See* 923 F.2d at 1231.

Here, we have a very different story. Du Pont passed along to Dr. Homsy and/or Vitek adverse literature on the use of Teflon in medical applications, as well as a disclaimer on such use. Du Pont also had no control over the IPI's packaging and, thus, could not easily warn its end-users. Finally, for reasons fleshed out more below, we believe that Du Pont was not so familiar with Dr. Homsy and Vitek's operations that a reasonable jury would conclude that it improperly relied upon them to pass on the warnings it provided in the same way ACL negligently relied upon Celotex.

Vitek to pass on to end-users any known dangers of the IPI because of: (1) their legally established and clear duty to warn end-users; (2) their undisputed leadership in the plastic prosthesis field; and (3) their superior access to oral surgeons and patients. Such a finding of reasonable reliance is not rebutted by any evidence that Vitek passed on to patients and oral surgeons inadequate warnings or that, even if they did, Du Pont had or should have had actual or constructive knowledge of this fact. Since there is significant evidence of the reasonableness of Du Pont's reliance on Dr. Homsy and Vitek to pass on the warnings Du Pont gave to them, and no proof that Du Pont actually knew that they were issuing inadequate warnings, we hold that Du Pont discharged its duty to warn in accordance with § 388 comment n.[37]

■ As a final note, we believe that the common law cannot countenance what Appellants insist we do, which is to make raw material suppliers guarantors of finished products over which they have little control. Under such a reading of the law, companies like Du Pont would have no choice but to take their products off the market entirely or to double-check their suitability in many new applications before making any sales. *See Childress*, 888 F.2d at 49 (citing with favor the district court's reasoning that imposing responsibility for a completed product on a component part supplier "would be contrary to public policy, as it would encourage ignorance on the part of component part manufactures [of the ultimate use of the component part] or alternatively require them to 'retain an expert in the client's field of business to determine whether the client intends to develop a safe product.'" (citation omitted)).

If we adhered to Appellants' theory, access to raw materials like Teflon for entrepreneurs seeking new applications would either disappear or be undermined by an inevitable increase in price. This, of course, would stymie the kind of beneficial scientific innovation which, sadly, did not take place here, but which has occurred in many other areas of human endeavor. We believe, for the reasons stated above, that the law has developed so as to preclude this result.

### 3. The district court properly held that PTFE and FEP were not defective products in and of themselves.

■ We also believe that the district court ruled properly that PTFE and FEP were not defective in and of themselves. Appellants contend that Du Pont is strictly liable for the defective design and manufacture of PTFE and FEP pursuant to Restatement 2d of Torts § 402A and Ohio statutory law. Section 402A (emphasis added) states:

One who sells any product *in a defective condition unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to property, if

(a) the seller is engaged in the business of selling a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

■ Without question, this section does not apply since there is no evidence that Du Pont's Teflon products, in and of themselves, were defective or that they were unreasonably dangerous independent of, and *prior to*, their incorporation into the IPI.[38] Indeed,

---

37. Appellants argue that Du Pont never passed on any warnings with respect to FEP, even after it knew in 1984 that FEP was used as the articulating surface of the IPI. However, there is no indication that Du Pont knew that FEP posed potential problems in this particular setting, unlike what it knew about PTFE in load-bearing joints. It is true that the February 21, 1966 letter from Du Pont to Dr. Leidholt noted that Teflon is subject to wear "under certain conditions of mechanical loading and movement." However, there is no indication that there were any tests, other than those done by Vitek, on

FEP's suitability in the weight-bearing situation of the TMJ. Thus, Du Pont had no clear knowledge of FEP's inadequacy in this application, even after the equivocal 1984 reports by Mr. Bernhardt.

38. *But cf. Jacobs* Jt.App. 361 (February 21, 1966 letter from Du Pont to Dr. Leidholt noting with respect to Teflon that "wear and cold flow may be expected under certain conditions of mechanical loading and movement"). Even taking into account this letter, we do not think that a reasonable jury could conclude that Teflon was defec-

the record reveals that PTFE and FEP have many useful industrial and medical applications for which its design is perfectly suited. *See, supra,* n. 11.

In similar situations, where a component part is not dangerous until incorporated into a finished product, courts have held that the component part supplier cannot be held liable on a common law design or manufacturing defect theory, unless the supplier exercised some control over the *final* product's design. *Compare Sperry v. Bauermeister,* 4 F.3d 596, 598 (8th Cir.1993) (applying Missouri law) ("suppliers of non-defective component parts are not responsible for accidents that result when the parts are integrated into a larger system that the component part supplier did not design or build"); *and Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 48–49 (6th Cir.1989) (applying Michigan law) (component part manufacturer is not liable for defective design of a final product when component part is not in and of itself defectively designed); *with DeSantis v. Parker Feeders, Inc.,* 547 F.2d 357, 361 (7th Cir.1976) (affirming jury verdict against component part manufacturer for the design defect of a finished product because every single part of that product was made by the component part manufacturer, and each part was dependent upon all the others for the product to work); *and Estate of Carey v. Hy–Temp Mfg., Inc.,* 702 F.Supp. 666, 670–71 (N.D.Ill.1988) (denying summary judgment to component part manufacturer where evidence showed that it influenced the design of the final product). Here, it cannot be disputed that Vitek, and Vitek alone, developed the IPI. Therefore, Appellants' failure to demonstrate that PTFE and FEP were defective and/or unreasonably dangerous in and of themselves, or that Du Pont influenced the design of the IPI, warrants entry of summary judgment on the § 402A design/manufacturing defect claim.

■ Turning now to Ohio statutory law on liability for defective design and manufacture, Ohio Rev.Code § 2307.75 states:

(A) Subject to divisions (D), (E) and (F) of this section, a product is defective in design or formulation if either of the following applies:

(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to subdivision (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;

(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

\* \* \* \* \* \*

(F) A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce.

We believe that subsection (F) of § 2307.75 exempts Du Pont from liability under this statute. Appellants have not offered any evidence that there was an alternative design for PTFE and FEP that would have avoided the injuries in this case, or that such an alternative would not have undermined the efficacy of these materials in the numerous industrial and medical applications for which they have been used successfully. Du Pont also cannot be held liable for introducing PTFE and FEP into the stream of commerce given their other uses.

■ In addition, Appellants cannot complain that Du Pont should have stopped selling Teflon products to Vitek once it learned in 1984 that the TMJ was a load-bearing joint and that the IPI was used to replace the meniscus in that joint. Despite Appellants' attempts to cast the 1984 reports by Mr. Bernhardt as all negative, it is clear that they reported conflicting views on the adequacy of the IPI. Thus, we believe that a

tive or unreasonably dangerous in and of itself given its many useful applications.

reasonable jury could not conclude that Du Pont improperly continued to sell Teflon products to Vitek even after it had this information.[39]

## D. *ADELMANN v. DU PONT*

### 1. *The district court did not grant summary judgment sua sponte.*

Appellants contend that the district court erred by granting summary judgment *sua sponte* on the issue of whether Du Pont fulfilled its duty to warn, under the bulk supplier/sophisticated purchaser rule, by giving warnings to Vitek. We reject this argument for a number of reasons.

First, Du Pont did cite in its summary judgment brief, albeit in a footnote, the two cases (*Whitehead* and *Byrd*) on which the district court relied for the proposition that "[b]ulk suppliers of inherently dangerous raw materials also are entitled as a matter of law to rely on sophisticated purchasers, informed of potential dangers from the product, who resell the raw material after repackaging it or incorporating the raw material into another product." *See Adelmann* Jt.App. 111. Second, Appellants responded to this argument with extensive briefing and exhibits both before and after the district court's December 7, 1992 summary judgment hearing. Third, at that hearing, Appellants' counsel contended that the record sufficiently

demonstrated that Du Pont did not meet its duty under this doctrine. Finally, Appellants did not provide specific evidence of what further discovery would have uncovered.[40]

This leads to the inevitable conclusion that: (1) The bulk supplier/sophisticated intermediary rule was fully and properly before the district court, and (2) the district court did not prematurely grant summary judgment on this basis. Simply stated, this was not a situation in which the non-moving party did not have an opportunity to address the grounds on which summary judgment was granted. *See, e.g., Routman v. Automatic Data Processing, Inc.,* 873 F.2d 970, 971 (6th Cir.1989) (reversing the grant of summary judgment based on grounds the non-moving party was unable to investigate pursuant to the district court's discovery order); *Brobst v. Columbus Servs. Int'l,* 761 F.2d 148, 154 (3rd Cir.1985) (reversing the grant of summary judgment based on grounds not advanced by the moving party and done without giving the non-moving party an opportunity to respond). As a result, Appellants assignment of error is rejected.

### 2. *The district court properly granted summary judgment on all claims.*

The district court was also correct in its application of Tennessee law. With respect

---

39. Appellants are not unaware of the weakness of their defective design and manufacturing claims against Du Pont. Even in the portion of their brief arguing these claims, Appellants focus not so much on whether PTFE and FEP were defective per se, but on whether Du Pont fulfilled any duty it might have had to warn about the dangers posed by PTFE and FEP when used in a load-bearing joint:

> DuPont cannot shield itself from liability by claiming that it had no duty to warn Vitek of dangers it knew existed when PTFE and FEP were used in medical devices such as the TMJ implants. DuPont wishes to escape all responsibility for the gross omissions it made with regard to PTFE and FEP. If DuPont had fully disclosed what it knew about PTFE and FEP, then this entire situation could have been avoided.

*See Jacobs* Appellants' Brief, p. 24.

40. Appellants suggest that the denial of their motion to compel discovery of all of Du Pont's pleadings in other IPI cases, while "perhaps

proper given the narrow nature of discovery on the legal question of duty, prevented Appellants from obtaining facts and depositions of non-party witnesses (particularly Homsy) taken in other DuPont cases." *See Adelmann* Appellants' Brief, p. 29 n. 3. Furthermore, they submit that other more recent IPI cases have developed facts not developed here.

Given the huge record in this case—including numerous excerpts from various depositions in which Dr. Homsy participated—and the fact that Appellants had from September, 1991 (when Du Pont's answer was filed), until June, 1992, to conduct discovery in this case, the argument that Appellants needed more time to discover relevant information is meritless. We also reviewed the pleadings and exhibits in other IPI cases provided by Appellants to see if any additional relevant information could have been gathered during an extension of the discovery period. *See Adelmann* Appellants' Brief, Exs. 2–6. No such information was found. Consequently, we reject the argument that Appellants were prejudiced by limited discovery.

to the dismissal of Appellants' failure to warn claims,[41] the district court relied upon *Whitehead v. Dycho* and *Byrd v. Brush Wellman, Inc., supra,* in making its ruling. In *Whitehead,* plaintiff was an employee of Magnavox, an electronics manufacturer. Magnavox bought naptha, an explosive chemical solvent, in bulk containers from defendant distributors (The Dycho Company and Buss Coatings). Magnavox placed the naptha in small containers for its employees to use in cleaning off glue from electronic equipment. The glue also sometimes got onto employees' work aprons, and Magnavox allowed plaintiff to take some naptha home with her to clean off her apron. When plaintiff put some naptha and her apron in her washing machine, an explosion occurred and caused her serious injuries. *See Whitehead,* 775 S.W.2d at 593–96.

Defendants successfully moved for summary judgment in the trial court on the grounds that, under § 388 of Restatement 2d of Torts,[42] they reasonably relied upon Magnavox, a sophisticated and knowledgeable intermediary, to pass on to its employees the known dangers of naptha. The trial court also found that summary judgment for defendants was proper because plaintiff's use of naptha was unforeseeable. *See* 775 S.W.2d at 596.

The Tennessee Court of Appeals reversed and remanded for a trial on the merits. It held that a question of fact existed on whether defendants adequately warned Magnavox of the dangers of naptha. Moreover, it believed that a jury should resolve the question of whether defendants' duty to warn ended with Magnavox. *See* 775 S.W.2d at 596–98.

The Tennessee Supreme Court reversed, citing, *inter alia, Adams v. Union Carbide Corp., supra.* The *Whitehead* court stated:

The record clearly supports a finding that Defendants provided adequate warnings to Magnavox. Material Safety Data Sheets were provided by ... the distributors Buss and Dycho ... to Magnavox. Labeling and warning labels were on the 55 gallon drums when they were delivered to Magnavox indicating that the product was "flammable" and "for industrial use only." Magnavox wrote its own specifications for the naptha products purchased from Dycho and Buss. Magnavox clearly knew and was knowledgeable of the dangers and propensities of naptha to heat, flame or sparks because of the possibility of explosion and fire. It was, therefore, reasonable for the Defendants to rely upon Magnavox to convey the information about the hazards of naptha to its employees within the context of comment n of the Restatement....

*See* 775 S.W.2d at 598.

The *Whitehead* court also held that plaintiff's claims failed to establish sufficient causation on the part of defendants: "We are of the opinion that the independent intervening act of Magnavox in placing naptha in small, pump-type containers with no label and failing to warn its employees of the dangerous nature of the product was the proximate cause of the accident." *See* 775 S.W.2d at 599. Finally, the court found relevant the fact that Magnavox "was the only party in a position to issue an effective warning to the Plaintiff." *See* 775 S.W.2d at 600. For these reasons, then, it reversed the court of appeals and reinstated the judgment for defendants. *See also Byrd,* 753 F.Supp. at 1413 (holding that a supplier of beryllium to an employer was not liable for a failure to warn employees of the product's dangers because the employer was adequately warned by the supplier, the employer's misconduct was the proximate cause of the plaintiff-employee's injuries, and the employer was the only party with reasonable access to plaintiff).

■■■ We believe that the analysis in *Whitehead* disposes of Appellants' duty to

---

**41.** For all practical purposes, Appellants abandoned any argument that PTFE and FEP were defectively designed. Their chief expert witness, Dr. Fellers, conceded that PTFE and FEP were not *per se* defective. Moreover, at oral argument of this appeal, Appellants' counsel represented that 90% of his clients' case hinged on the determination of whether, under comment n of Restatement 2d of Torts § 388, Du Pont reasonably relied upon Dr. Homsy and Vitek to pass necessary warnings on to end-users.

**42.** This section, and the relevant commentary, is set out in *on* pp. 1235–37.

warn claims. As an initial matter, *Whitehead* indicates that a supplier of materials whose dangers are known or suspected does have a duty, under Tennessee law, to warn about those dangers. However, if that supplier does provide adequate warnings to a knowledgeable intermediary, its duty is discharged. Similarly, if the intermediary's actions are the proximate cause of the plaintiff's injuries, a claim against the supplier must fail. Lastly, if the intermediary is the only party with reasonable access to end-users of the product, a supplier cannot be held liable for a failure to warn.

All of these elements are present in this case. Du Pont did know of potential dangers of using Teflon in medical applications, simply because such use was, and in many respects continues to be, experimental. This knowledge triggered a duty to warn under Tennessee law which Du Pont attempted to fulfill with its 1967 letter to Dr. Homsy and its 1977 disclaimer statement to Vitek.

 With respect to the adequacy of Du Pont's warnings to Dr. Homsy and Vitek, the record shows that there are no material issues of fact necessitating a trial. It is undisputed that in addition to cautioning against the use of Teflon products in *any* medical application, Du Pont specifically brought to Dr. Homsy and Vitek's attention the Charnley study indicating that PTFE was a poor material for prostheses in load-bearing joints like the hip. It is also beyond question that there were never any studies of FEP's suitability in such load-bearing joints about which Du Pont could have warned Vitek. Given Dr. Homsy and Vitek's acknowledged leadership in the prostheses field, their thorough familiarity with both positive and negative reports of the usefulness of Teflon in such prostheses, and their duty to warn about the dangers of the IPI pursuant to both regulatory and common law, it was reasonable for Du Pont to rely on Dr. Homsy and Vitek to pass on any warnings it gave to them.

We must also note that Du Pont did not have the same kind of access to end-users as did Vitek, the manufacturer of the defective product. In addition, the record demonstrates that Vitek's failure to develop a sturdy meniscus replacement was the proximate cause of Appellants' injuries, not Du Pont's failure to warn.

Du Pont, therefore, is entitled to summary judgment on Appellants' duty to warn claims under any of the three theories set out by *Whitehead.* Since the district court properly reached this conclusion, we affirm its dismissal of these claims.

Appellants argue that Du Pont could not reasonably rely upon Dr. Homsy and Vitek to pass on warnings about Teflon's use in medical applications because the product literature that Vitek sent to Du Pont in 1977 did not convey any such warnings. *See Adelmann* Jt.App. 894–95. However, Du Pont correctly points out that none of those product brochures described the use of Teflon resins in the TMJ. Indeed, the IPI was not even fashioned until several years later. Furthermore, the product brochures were *not* warnings placed in IPI packaging, and there is no evidence that Du Pont knew what warnings Vitek had given until this litigation began. Given these facts, we do not think that the product brochures sent to Du Pont by Vitek in 1977 create a material issue of fact on the reasonableness of Du Pont's reliance on Vitek to pass on adequate warnings regarding the use of Teflon in the IPI.

 We also reject Appellants' argument that Du Pont should have insisted that Vitek include the warnings that it received from Du Pont in the IPI's packaging. Although Du Pont may have done this in another transaction, we believe that it fulfilled its duty to warn under § 388 by giving adequate warnings to Dr. Homsy and Vitek.

The additional cases cited by Appellants in support of their argument that Du Pont failed to fulfill its duty to warn, which have not already been analyzed in this opinion, are distinguishable. Virtually all of these decisions involve situations in which there was a factual dispute on whether the bulk supplier's intermediary was properly warned of the known risks of the supplier's product. *See Sowell v. American Cyanamid Co.,* 888 F.2d 802, 804 (11th Cir.1989) (applying Florida law to Federal Torts Claims Act case); *Bryant v. Technical Research Co.,* 654 F.2d 1337, 1344–45 (9th Cir.1981) (applying Idaho law); *Sli-*

*man v. Aluminum Co. of Am.,* 112 Idaho 277, 731 P.2d 1267, 1272–74 (1986), *cert. denied,* 486 U.S. 1031, 108 S.Ct. 2013, 100 L.Ed.2d 601 (1988); *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1162–63 (Ind.App.1988); *Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 604 A.2d 445, 463–65 (1992); *Barsness v. General Diesel & Equip. Co.,* 383 N.W.2d 840, 846 (N.D.1986); *Binder v. Jones & Laughlin Steel Corp.,* 360 Pa.Super. 390, 520 A.2d 863, 867–68, *app. denied,* 516 Pa. 631, 634, 533 A.2d 90, 92 (1987); *Zacher v. Budd Co.,* 396 N.W.2d 122, 135 (S.D.1986). In addition, there is no question that Du Pont warned Dr. Homsy and Vitek of all of the apparent dangers of using Teflon in medical applications.

■ The last case cited by Appellants held that, under New York law, the bulk supplier/sophisticated intermediary rule should not apply beyond the prescription drug setting. *See Billsborrow v. Dow Chem., U.S.A.,* 139 Misc.2d 488, 527 N.Y.S.2d 352, 354–55 (Sup.Ct.1988), *rev'd on other grounds,* 177 A.D.2d 7, 579 N.Y.S.2d 728 (1992). Nothing in § 388, its commentary, or Tennessee law supports such a limitation, and we see no reason for narrowing the doctrine in this way.

Du Pont submitted at oral argument that *Whitehead* and *Byrd* are distinguishable from the facts of this case in that both of those decisions dealt with inherently dangerous materials. Thus, Du Pont suggests that the district court erred in holding that there was a duty to warn under Tennessee law in this case.

We do not read *Whitehead* and *Byrd* as narrowly as does Du Pont. While the products in those cases (naptha and beryllium, respectively) did pose dangers in virtually all uses, nowhere do those opinions, or any others interpreting Tennessee law that we have found, announce that their reasoning does not apply to situations like the one here, in which a generally safe product becomes dangerous in a specific use.

■ Du Pont also argues on appeal that we should affirm the district court's decision on the alternative ground of the component part doctrine discussed in *Jacobs, supra.*[43] Du Pont claims that Tennessee courts also adhere to this doctrine, and it cites *Kellar v. Inductotherm Corp.,* 498 F.Supp. 172 (E.D.Tenn.1978), *aff'd without op.,* 633 F.2d 216 (6th Cir.1980), in support of its position.

In *Kellar,* the district court held that Tennessee law did not impose product liability upon the supplier of a furnace and an attached rear deck which were incorporated by plaintiff's employer into a larger foundry work area. Plaintiff was hit by an object and fell into the furnace, where he was severely injured. The *Kellar* court concluded that it was the foundry that designed the unsafe work area which caused plaintiff's injuries and that, therefore, the component part supplier was free from liability. *See* 498 F.Supp. at 175.

*Kellar,* however, is of limited precedential value because the court did not give much analysis to plaintiff's failure to warn theories. In a footnote, the district court stated the following:

> Plaintiffs also argue that the furnace was defective for a failure to warn of the danger. Aside from any other weakness of this theory, all parties were generally aware of the danger, and no warning would have deterred plaintiff at the time of the accident. Accordingly, there could be no causal connection between any failure to warn and the harm. The Court, therefore, focuses its discussion upon the alleged failure of the manufacturer to attach a safety device.

*See* 498 F.Supp. at 175 n. 1. Because *Kellar,* or any subsequent Tennessee case,[44] has not

---

**43.** Appellants argue that, in the absence of a cross-appeal, Du Pont cannot make this argument. However, it is well-settled in this circuit that an appellee can propose alternative grounds in support of a trial court judgment so long as those arguments were presented below. *See Ball v. Abbott Advertising, Inc.,* 864 F.2d 419, 421 (6th Cir.1988) ("'A defendant may raise an alterna-

tive theory without cross-appealing.'") (citation omitted).

**44.** Another Tennessee district court relied upon *Kellar* to dismiss yet another suit against Du Pont arising from its supply of PTFE and FEP to Vitek for use in the IPI. *See Miller v. E.I. Du Pont de Nemours & Co.,* 811 F.Supp. 1286, 1293–94

specifically applied the component part doctrine to a duty to warn claim such as Appellants' (in which the danger of a component part was not easily comprehended without warnings from its manufacturer and/or the finished product manufacturer), and because it is not necessary for us to affirm on this basis, we decline to rely upon the component part doctrine as an alternative basis for affirming the district court.

■ Turning to Appellants' other claims, there is no evidence that Du Pont ever made a misrepresentation or an express warranty concerning Teflon's effectiveness in the TMJ or other load-bearing joints. None of the documents cited by Appellants supports these claims. *See Adelmann* Jt.App. 1020, 1055, 1059, 1060. To the contrary, the record reveals that Du Pont specifically disclaimed any responsibility for the success or failure of Teflon in ·medical applications. Even if Du Pont did make such assurances, there is no evidence that Vitek, oral surgeons, or patients ever heard of these assurances or relied upon them.

■ In terms of the implied warranty of fitness for a particular purpose, as pointed out by the district court, there is no evidence that Vitek relied on Du Pont to select appropriate materials for its applications. Instead, the record shows that Dr. Homsy believed that he knew what the appropriate materials were and merely ordered them. These facts provide no basis for a finding of breach of the implied warranty of fitness for a particular purpose.

Finally, with respect to the implied warranty of merchantability, Appellants stress that the disclaimers issued by Du Pont never mentioned the term "merchantability" as required by Tennessee law. Appellants invoke Tenn.Code Ann. § 47–2–316 in support of this argument. The statute states, in relevant part:

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchantability and in case of a writing must be conspicuous. . . .

(E.D.Tenn.1992). For the reasons stated in the text, we choose not to follow its reliance on

(3) Notwithstanding subsection (2):

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions such as "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain there is no implied warranty. . . .

■ Du Pont correctly points out that Appellants did not raise below their "merchantability" argument. Appellants, therefore, have not preserved this assertion for appeal. *See In re Charfoos,* 979 F.2d 390, 395 (6th Cir.1992) ("[A]n appellate court should not pass on issues not raised at the trial level.").

■ Even assuming the argument was properly before us, we must note that the disclaimer letters to Dr. Homsy at both Methodist Hospital and Vitek contained clear language indicating that Du Pont made no promises, express or implied, about the suitability of Teflon for medical applications. Rather, Du Pont openly stated that it was up to the medical profession to make such determinations. We believe that this language is the equivalent of the mention of the word "merchantability." *See* Tenn.Code Ann. § 47–2–316(3). Appellants, thus, cannot rely on § 47–2–316 to survive summary judgment on their breach of the implied warranty of merchantability claim.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the district courts' grants of summary judgment in favor of Du Pont in both *Jacobs* and *Adelmann.*